# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | DIVISION ONE |
| | ) | |
| Respondent, | ) | No. 76014-9-I |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| KENNETH ROSHAWN TURNER, | ) | |
| | ) | |
| Appellant. | ) | FILED: February 21, 2017 |
| | ) | |

DWYER, J. — Kenneth Turner appeals from the judgment entered on a jury's verdict finding him guilty of theft in the second degree pursuant to RCW 9A.56.040(1)(d), theft of an access device. Turner was sentenced to 17 months of confinement and ordered to pay a $500 victim penalty assessment (VPA), a $100 felony DNA collection fee, and $200 in court costs. On appeal, Turner contends that (1) the prosecuting attorney committed flagrant misconduct that deprived him of a fair trial, (2) his defense counsel was ineffective for failing to object to the prosecutor's remarks, (3) the sentencing court's imposition of the VPA and DNA fee violated his substantive due process right, and (4) the trial court erred by imposing "court costs," despite its finding that Turner was indigent. Finding no error, we affirm.

I

On June 1, 2014, Turner went to a club in downtown Olympia along with his girlfriend, Tanya Satak, and a friend, Robert Simerly. Kylie Thorson, her husband, and a group of her friends were also at the club. A fight broke out between Turner and some of Thorson's friends and Turner was ejected from the club. The fight continued in the parking lot. During the altercation between Turner's group and Thorson's group, Thorson lost her wristlet that contained her cell phone and two credit cards.

During the melee, Satak tased Thorson, after which Turner, Satak, and Simerly got into a car and drove away. Thorson called the police, who tracked her cell phone to Simerly's house. When the police arrived at the house, they discovered Simerly outside the house. He was holding a trash bag containing Thorson's destroyed cell phone. The police were unable to locate the credit cards.

The State charged Turner by amended information with one count of theft in the second degree and one count of malicious mischief in the third degree. The jury returned a verdict finding Turner not guilty of malicious mischief but guilty of theft in the second degree.[1] Turner was sentenced to 17 months confinement and ordered to pay a $500 VPA, a $100 DNA collection fee, and $200 in court costs. Based on its finding of Turner's indigency, the trial court declined to impose witness costs. Turner timely appealed.

---

[1] Turner was tried jointly with Satak, who was charged and convicted of assault in the fourth degree.

II

Turner contends that the prosecutor committed flagrant misconduct during closing argument, thus depriving him of a fair trial. This is so, he asserts, because the prosecutor misstated the State's burden of proof, misrepresented facts, impugned the role and integrity of defense counsel, invaded the province of the jury, and opined on Turner's veracity. Turner also contends that he received ineffective assistance of counsel because his attorney failed to object to the alleged misconduct.

To prevail on a claim of prosecutorial misconduct, the defendant must show that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and circumstances at trial. State v. Miles, 139 Wn. App. 879, 885, 162 P.3d 1169 (2007). A defendant must object to a prosecutor's improper argument at trial. "'[C]ounsel may not remain silent, speculating upon a favorable verdict, and then, when it is adverse, use the claimed misconduct as a life preserver on a motion for new trial or on appeal.'" State v. Reed, 168 Wn. App. 553, 577-78, 278 P.3d 203 (2012) (alteration in original) (internal quotation marks omitted) (quoting State v. Russell, 125 Wn.2d 24, 85-86, 882 P.2d 747 (1994)). If a defendant does not object to the alleged misconduct at trial, the defendant is deemed to have waived any claim of error unless it is shown that "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" State v. Emery, 174 Wn.2d 741, 761, 278 P.3d 653 (2012) (quoting State v. Thorgerson, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

A

Turner first contends that the prosecutor committed misconduct by misinforming the jury as to its duty to independently determine witness credibility, by offering the prosecutor's personal opinion as to the veracity of a witness, and by impugning the role and integrity of the defense counsel. These contentions are unavailing.

Determinations of credibility rest solely with the trier of fact. State v. Thomas, 150 Wn.2d 821, 874, 83 P.3d 970 (2004). A prosecutor may not offer a personal opinion of the veracity of a witness. State v. Neidigh, 78 Wn. App. 71, 74, 895 P.2d 423 (1995). However, a prosecutor has wide latitude to argue reasonable inferences from the evidence, including evidence respecting the credibility of witnesses. Thorgerson, 172 Wn.2d at 448 (citing State v. Hoffman, 116 Wn.2d 51, 94-95, 804 P.2d 577 (1991)).

The State called Simerly as a witness against Turner and Satak at trial. Simerly testified that he was reluctant to appear in court and did not want to testify. He expressed concern about testifying against the defendants. Following Simerly's testimony, Turner and Satak each testified that they believed that Simerly was high on methamphetamine at the time of the incident. In rebuttal to this testimony, the State called Officer Brenda Anderson, who had interviewed Simerly upon arriving at his house following the incident. Officer Anderson testified to her belief that Simerly was not under the influence of drugs during the incident.

During closing argument, Turner's counsel argued that Turner's and Satak's observations as to Simerly's drug use were more reliable than Officer Anderson's observations, as Turner and Satak had both previously observed Simerly while under the influence of drugs. Moreover, defense counsel asserted, Simerly's testimony implicating Turner was not credible because Simerly was biased by his own self-interest in avoiding a criminal charge.

Turner's counsel argued:

> I'm going to present another possibility to you . . . Mr. Simerly did something and instead is shifting the blame to Mr. Turner. Rather than he, himself, get into trouble, he is going to have his friend get in trouble. . . . Detective Anderson indicated it was much less uncomfortable when he made the recorded statement to her. Well, of course not. He took Kylie Thorson's property, destroyed it, and instead shifted the blame to Mr. Turner.

Although Turner's counsel argued to the jury that Simerly's testimony was unreliable, Satak's counsel subsequently argued that the jury should trust those parts of Simerly's testimony that indicated that Thorson and her group instigated the fight at the club.

During rebuttal argument, the prosecutor first addressed the assertions that Simerly was high on methamphetamine during the incident and that his testimony was not reliable, arguing:

> And they said, well, couldn't he just be coming down? No, that's not it. That's not how that works. You saw her here again when she talked about how he appeared on the stand. Again, no, no, that's not him high and certainly not, as Ms. Satak says, using meth. So where does that come from? That's Ms. Satak's bare assertion with literally no facts to back that up. That's a smear campaign, and that's what you do when you don't have facts. That's what you do and there is nothing that actually supports those statements.

- 5 -

The prosecutor then addressed the defense contention that only certain portions of Simerly's testimony were credible.

> We talked about all of the things about Mr. Simerly and his statements, but notably all the statements involving Mr. Simerly that the defendants say there is no way he is lying about that, he is lying about that, but he is telling truth about everything else that helps them and is accurate that says bad things about the witnesses for the other party. Those things are all true, except when we get to the parts where he is uncomfortable, and they say bad things about the defendant? Well, it's a double-edged sword. It cuts both ways. You can't have it both ways. Either he is lying about everything or he is telling the truth about everything, but you can't pick and choose the parts that help you and the parts that hurt you, and that's what they want you to do. So I would submit to you his credibility, especially based on what you see on the stand, is evaluated in the context of what all the other witnesses say.

Turner did not object to the prosecutor's statements.

On appeal, Turner contends that the prosecutor's statement "That's a smear campaign" impugned the role and integrity of defense counsel and amounted to the prosecutor's personal opinion as to the veracity of a witness. Turner also contends that the prosecutor's rebuttal argument invaded the province of the jury by instructing the jury that they must believe all of Simerly's testimony or none of it. Turner is wrong on both counts.

First, it is clear that the prosecutor's statement "That's a smear campaign" was neither an explicit statement of a personal opinion nor a disparagement of defense counsel. When understood in the context of the entire rebuttal argument, the prosecutor was responding to defense counsel's arguments that Simerly was both (1) shifting blame away from himself and on to Turner and Satak, and (2) high on methamphetamine during the incident, contrary to Officer Anderson's testimony. In so responding, the prosecutor argued to the jury that

- 6 -

no evidence supported the defendants' version of events.[2]  The prosecutor's statement was nothing more than an apt characterization of the defense's strategy of discrediting Simerly.  Moreover, the jury had heard from Simerly's own lips of his reluctance to testify.  The prosecutor's argument was an allowable explanation of just how warranted Simerly's reluctance may have been.  Given that part of the defense strategy was to disparage (or, colloquially, "smear") Simerly, the jury could reasonably conclude that his reluctance was understandable.  The prosecutor did not engage in misconduct in addressing this issue.

Second, it is also clear from the context of the argument that the prosecutor was not instructing the jurors that they had to believe all of Simerly's testimony or believe none of it.  Rather, the prosecutor was arguing in response to defense counsel's contention that the jury should believe only those portions of Simerly's testimony that were favorable to the defendants while disregarding those portions that were not.  When the prosecutor stated "but *you* can't pick and choose the parts that help *you* and the parts that hurt *you*," the prosecutor was referencing the defendants themselves, not the jurors.  (Emphasis added.)  Moreover, the prosecutor immediately followed this argument with the suggestion that the jurors themselves should evaluate Simerly's credibility in light of and in the context of all of the testimony.  The prosecutor's statements were not improper.

---

[2] Moreover, the prosecutor was characterizing Satak's testimony as part of a "smear campaign," not Turner's testimony.

B

Turner next asserts that the prosecutor misstated the State's burden of proof, misrepresented testimony to the jury, and impugned the role and integrity of defense counsel during rebuttal argument.

During closing argument, Turner's counsel argued that the State had failed to prove beyond a reasonable doubt every element of theft in the second degree. Specifically, defense counsel argued that theft of an access device—in this case the missing credit cards—requires that the State prove that the credit cards were usable at the time that they were stolen, which, he claimed, the State had failed to do.[3]

> [T]he defense submits the State has not proven that fact that an access device had been stolen.
> I anticipate under rebuttal [the prosecutor] will say this is a red herring, this is unnecessary for us to prove this, it's unreasonable for the defense to assist (sic) insist that we bring this before the jury. One, this is not a red herring. The instruction requires the State prove every element, including that an access device was stolen. This is not unnecessary.
>
> . . . .
>
> Defense submits that the State has not presented not only a posit of evidence that, in fact, this - - that any access device or any card or whatever could be used when it was last in possession of it's (sic) lawful owner, the defense submits there is a complete lack of evidence. What do we have from the State? We essentially have an assumption, well, she has a credit card and a debit card in her possession, it must be good. It must be something that can be used at that time. That's not what the instruction says. The instruction requires evidence that it can be used, not some vague

---

[3] Pursuant to RCW 9A.56.010(1), an "[a]ccess device" means "any card, plate, code, account number, or other means of account access that can be used alone or in conjunction with another access device to obtain money, goods, services, or anything else of value, or that can be used to initiate a transfer of funds, other than a transfer originated solely by paper instrument." Jury instruction 14 contained the definition of "access device" and then stated, "The phrase 'can be used' refers to the status of the access device when it was last in possession of its lawful owner, regardless of its status at a later time."

assumption that merely because something may be in there that it can be used.

. . . .

So let's go over maybe some of the things that should be used, and I anticipate the prosecutor saying, but it's unnecessary for me to do that, she said she had a credit card, she said she canceled it, and it was used in the bar. Well, we don't really have any type of evidence, physical evidence of this, and it's not unreasonable to require that, because as we know, a bank statement is as easily obtained as printing the function on a computer.

. . . .

Instead what do we have from the deputy prosecutor and the witnesses? A general, vague assumption, general vague, if she had the credit cards on her, they must be good and they must be able to be used, otherwise she wouldn't have them on her. Members of the jury, that is not what is required by the statute. That is not what is required by the instruction. Beyond a reasonable doubt is proven by evidence that either supports the contention or supports a strong inference, therefore, that the cards could be used. Mere possession of them is not proof beyond a reasonable doubt that these cards could be used as an access device as defined by Instructions No. 14.

During rebuttal, the prosecutor addressed the defense argument by stating:

I want to touch on the access device, and I think this is important. First of all, I have never used the phrase "red herring" in my life. That is not how I talk. But more importantly, that's white noise, and it's a ridiculous argument, and it isn't a burden that I have to prove to you, but to be very clear, you do have evidence. [Thorson] specifically told you that not only did she have those items but she used those items to pay for drinks at the club, very specifically. There is no requirement, as you will see in your jury instructions, for bank statements, for credit card statements. That is insulting and it's offensive.

No objection was interposed in response to the prosecutor's rebuttal argument.

On appeal, Turner contends that the prosecutor's statement "it isn't a burden that I have to prove to you" was a misstatement of the law. Turner also contends that the prosecutor's statement, "[Thorson] specifically told you that . . .

- 9 -

she used those items to pay for drinks at the club," was a misrepresentation of the facts. Finally, Turner contends that the prosecutor's statement "That is insulting and it's offensive" impugned the role and integrity of defense counsel.

To establish prosecutorial misconduct, Turner must show that the prosecutor's statements were both improper and prejudicial in the context of the entire argument. Moreover, as Turner did not object to the prosecutor's statements at trial, he must demonstrate that the statements were "so flagrant and ill intentioned that no curative instruction would have been capable of neutralizing the resulting prejudice." Reed, 168 Wn. App. at 578. He has failed to do so.

1

Turner asserts that the prosecutor's statement "it isn't a burden that I have to prove to you" misstated the State's burden of proof and resulted in prejudice with a substantial likelihood of affecting the jury's verdict.

Although the prosecutor's statement could appear—in isolation—to have been a misstatement of the State's burden to prove beyond a reasonable doubt that the credit cards were access devices, the same cannot be said when the statement is considered in the context of the entire argument.

During closing argument, Turner's counsel argued that the State should have presented physical evidence that the credit cards were usable.

> So let's go over maybe some of the things that *should be used* . . . . Well, we don't really have any type of evidence, physical evidence of this, and it's not unreasonable to require that, because as we know, a bank statement is as easily obtained as printing the function on a computer.
> . . . .

> [W]as the account in default? Was there enough money to be used in that? . . . How can that be determined? Again, a bank statement.

(Emphasis added.) Defense counsel then told the jury that the State had presented a "general, vague assumption" that the cards were usable, and "[t]hat is not what is required by the instruction." Given this context, the prosecutor was correct in stating that the State did not have a burden to prove usability of the credit cards through the production of bank statements, credit card statements, or the like.[4]

In any event, the State's burden to prove beyond a reasonable doubt that Turner had stolen an access device was properly stated in the jury instructions, as was the definition of both "access device" and "can be used." Moreover, Turner has not shown that any prejudice arose from the prosecutor's statement that could not have been neutralized through a curative instruction. Indeed, our Supreme Court has held that far more egregious claimed misconduct can be cured through such an instruction. See State v. Warren, 165 Wn.2d 17, 29-30, 195 P.3d 940 (2008) (holding that a curative instruction remedied the prosecutor's three mischaracterizations of the State's burden). Thus, Turner has failed to show prejudice. He is not entitled to appellate relief.

---

[4] The jury heard testimony that Thorson canceled the credit cards after they were stolen in order to avoid fraudulent charges—testimony that supports the State's position that the cards were usable at the time that they were stolen. The jury was free to credit that testimony and find beyond a reasonable doubt that the credit cards were access devices. Indeed, no claim of evidentiary insufficiency is alleged on appeal.

2

Turner next contends, and the State concedes, that the prosecutor misstated part of Thorson's testimony by contending that Thorson had testified that she used the credit cards to pay for drinks at the club.[5] However, this alone does not establish that the prosecutor's misstatement resulted in prejudice with a substantial likelihood of affecting the jury's verdict or that any prejudice could not have been neutralized through a curative instruction.

The prosecutor herself cautioned the jurors that they were to rely on their own recollection of the evidence, not counsels'.

> Everything I'm going to say to you is my interpretation of the evidence it's my recollection of what you have heard over the last several days, but you are the trier of the facts. Anything I say, anything counsel says is simply our recollection. If that differs in any way from what you recall and what your notes are, your notes and your recollection is correct. So please disregard and rely on what you remember evidence to be. Any inaccuracies are not intentional on the part of the parties, or any differences.

The trial court's instructions to the jury likewise cautioned the jury that counsels' statements were not evidence and that any remarks, statements, or arguments made by counsel that were not supported by the evidence or the law should be disregarded. We presume that the jurors followed the court's instructions. State v. Stenson, 132 Wn.2d 668, 729-30, 940 P.2d 1239 (1997).

Turner did not object to the prosecutor's misstatement. He has failed to demonstrate that the misstatement resulted in prejudice with a substantial likelihood of affecting the jury's verdict. Moreover, he has not shown that a

---

[5] Thorson testified that she used cash to enter the club and to purchase drinks.

specific curative instruction would not have eliminated any prejudice. State v. Brown, 132 Wn.2d 529, 561, 940 P.2d 546 (1997). He is not entitled to appellate relief.

3

Turner next asserts that the prosecutor's remark "That is insulting and it's offensive" impugned the role and integrity of defense counsel.

It is improper for the prosecutor to disparagingly comment on defense counsel's role or impugn defense counsel's integrity. Thorgerson, 172 Wn.2d at 451 (citing Warren, 165 Wn.2d at 29-30).

Here, the prosecutor's statement that defense counsel's argument was "insulting" and "offensive," while not a direct comment on defense counsel's role, was nevertheless unprofessional and improper. Such an offending utterance does not assist the jury in understanding the evidence or applying the law. Indeed, it serves no purpose other than to disparage opposing counsel's argument.

Nevertheless, Turner has not shown that the prosecutor's wrongful utterance was so flagrant and ill intentioned that any prejudice could not have been redressed with a curative instruction. Moreover, Turner has not shown a substantial likelihood that the prosecutor's remark affected the jury's verdict. See State v. Negrete, 72 Wn. App. 62, 66-67, 863 P.2d 137 (1993) (prosecutor's statement that defense counsel was being paid "to twist the words of the witnesses" was improper, but was not shown to have affected the verdict).

Accordingly, Turner has again failed to establish prejudice. No entitlement to appellate relief has been shown.

C

Finally, Turner contends that he received ineffective assistance of counsel. This is so, he asserts, because his counsel failed to object to the prosecutor's misconduct at trial. We disagree.

Constitutionally ineffective assistance of counsel can be established only if the defendant shows that (1) counsel's performance, when considered in light of all the circumstances, fell below an objectively reasonable standard of performance, and (2) there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. Hassan, 151 Wn. App. 209, 216-17, 211 P.3d 441 (2009). "Judicial scrutiny of counsel's performance must be highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 669. Failing to satisfy either part of this analysis ends the inquiry. State v. Hendrickson, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

Turner's first assertion, that his counsel was ineffective for failing to object to the prosecutor's statements regarding the State's burden and witness testimony, fails the second prong of the Strickland analysis. "In assessing

- 14 -

prejudice, 'a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to the law' and must 'exclude the possibility of arbitrariness, whimsy, caprice, "nullification" and the like.'" State v. Grier, 171 Wn.2d 17, 34, 246 P.3d 1260 (2011) (quoting Strickland, 466 U.S. at 694-95).

As discussed herein, the jury was properly provided with a "to convict" instruction that set out the State's burden of proof as to each essential element of theft in the second degree. The jurors were also properly instructed to rely solely on their own memory of the evidence and to disregard any statements by counsel to the contrary. It is presumed that the jury follows the court's instructions. Stenson, 132 Wn.2d at 729-30. Prejudice cannot be established by claiming that the jurors may have ignored their instructions. Grier, 171 Wn.2d at 34. Accordingly, Turner does not establish prejudice on these claims.

Turner's next assertion—that his counsel was ineffective for failing to object to the prosecutor's statement that defense counsel's argument was "insulting" and "offensive"—fails the first prong of the Strickland analysis. "Because the presumption runs in favor of effective representation, the defendant must show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel." State v. McFarland, 127 Wn.2d 322, 336, 899 P.2d 1251 (1995). "[T]he presumption of adequate representation is not overcome if there is any 'conceivable legitimate tactic' that can explain counsel's performance." In re Det. of Hatfield, 191 Wn. App. 378, 402, 362 P.3d 997 (2015) (quoting State v. Reichenbach, 153 Wn.2d 126, 130, 101 P.3d 80

(2004)). Our inquiry, in this regard, is an objective—not subjective—inquiry. If any competent attorney could have acted—or not acted—as did the counsel in question, then the representation has not been shown to be constitutionally ineffective.

Turner has not established the absence of any conceivable tactical reason for not objecting to this portion of the prosecutor's rebuttal argument. It is not an uncommon practice for attorneys to refrain from objecting to statements made in closing argument. "A decision not to object during summation is within the wide range of permissible professional legal conduct." In re Pers. Restraint of Davis, 152 Wn.2d 647, 717, 101 P.3d 1 (2004). Indeed, appearing too hostile during closing argument may diminish one's likeability with the jury at a crucial stage of the proceeding. See Chris Zulanas, *How to Deliver an Effective Closing Argument*, 39 Am. J. Trial Advoc. 365, 366 (2015).

Furthermore, from this trial record, we can easily conceive of a legitimate strategic reason for not objecting to the prosecutor's overly-sensitive, hyperbolic exclamations during rebuttal argument. Many good lawyers would welcome an opportunity for the jury to observe opposing counsel act in an unprofessional, overly-sensitive manner. It seldom benefits a public prosecutor to personally "play the victim card." A good lawyer may very well believe that his client's cause is only aided by such unprofessional behavior and may refrain from objecting so as not to give any credence to opposing counsel's protestations. A tactical decision to allow the prosecutor's conduct to remain unchallenged, believing that the jury would not favor such foolish conduct, does not fall below an objectively

reasonable standard of competent performance. Indeed, the jury acquitted Turner of the malicious mischief charge—indicating that it was not at all entirely persuaded by the prosecutor's conduct and argument. Accordingly, Turner does not establish an entitlement to appellate relief.[6]

## III

### A

Turner next contends that the imposition of the mandatory $100 DNA collection fee, pursuant to RCW 43.43.7541, and the imposition of the mandatory $500 VPA, pursuant to RCW 7.68.035, results in an unconstitutional denial of substantive due process when applied to defendants who do not have the ability, or likely future ability, to pay such fees. This is so, he asserts, because the imposition of mandatory legal financial obligations (LFOs) on individuals who will likely never be able to pay those fees is not rationally related to a legitimate state interest. Turner is wrong.

The level of review applied in a substantive due process challenge depends on the nature of the interest involved. State v. Mathers, 193 Wn. App. 913, 927, 376 P.3d 1163 (2016) (citing State v. Beaver, 184 Wn. App. 235, 243, 336 P.3d 654 (2014), aff'd, 184 Wn.2d 321, 358 P.3d 385 (2015)), review denied, 186 Wn.2d 1015 (2016). Where no fundamental right is implicated, the proper standard of review is the rational basis test. Mathers, 193 Wn. App. at 927.

---

[6] As the prosecutor's statements "That's a smear campaign" and "Either he is lying about everything or he is telling the truth about everything" were not misconduct, it follows that Turner's defense counsel was not ineffective for failing to object to these statements. Turner's appellate contentions to the contrary are unavailing.

Substantive due process requires that deprivations of life, liberty, or property be substantively reasonable or supported by some legitimate justification. U.S. CONST. amend. V, XIV, § 1; WASH. CONST. art. I, § 3; Nielsen v. Dep't of Licensing, 177 Wn. App. 45, 53, 309 P.3d 1221 (2013). "Due process precludes the jailing of an offender for failure to pay a fine if the offender's failure to pay was due to his or her indigence." Mathers, 193 Wn. App. at 927. "Under certain circumstances, however, the State may imprison an offender for failing to pay his or her LFOs, such as if the offender is capable of paying but willfully refuses to pay or if the offender does not make a genuine effort to seek employment or borrow money in order to pay." Mathers, 193 Wn. App. at 927-28 (citing State v. Nason, 168 Wn.2d 936, 945, 233 P.3d 848 (2010)).

Substantive due process rights are not implicated until the State seeks to enforce collection of the LFOs. State v. Curry, 62 Wn. App. 676, 681, 814 P.2d 1252 (1991), aff'd, 118 Wn.2d 911, 917, 829 P.2d 166 (1992). This is so because it is not until that point in time that an indigent offender "'may be faced with the alternatives of payment or imprisonment.'" Curry, 62 Wn. App. at 681 (quoting United States v. Pagan, 785 F.2d 378, 381-82 (2nd Cir. 1986)); State v. Shelton, 194 Wn. App. 660, 672-73, 378 P.3d 230 (2016), review denied, 386 P.3d 1088 (2017).

The mandatory DNA fee and VPA are rationally related to legitimate state interests. These LFOs provide funding for the State to collect, analyze, and store DNA, as well as fund comprehensive programs to encourage and facilitate testimony by victims and witnesses of crimes. State v. Seward, 196 Wn. App.

- 18 -

579, 584-85, 384 P.3d 620 (2016). These LFOs are not unconstitutional on their face or as applied to indigent defendants. Curry, 118 Wn.2d at 918 (discussing VPA); State v. Lundy, 176 Wn. App. 96, 102-03, 308 P.3d 755 (2013) (discussing VPA and DNA collection fees). The imposition of these LFOs on all offenders, prior to any individualized determination of ability to pay, is rationally related to a legitimate state interest for two reasons: (1) although not all defendants will be able to pay these mandatory LFOs, some will be able to pay, and (2) a defendant's indigency at the time of conviction may not always persist, and the State may be able to collect these fees at a later time. Seward, 196 Wn. App. at 585.

Here, Turner's defense counsel requested that only the mandatory LFOs be imposed, which he described as the $100 DNA fee, the $500 VPA, and $200 in court costs. The sentencing court assessed only those fees, and "based on a previous finding of indigency," waived the discretionary $250 witness fee requested by the State. The State has not sought enforcement of these LFOs. Accordingly, Turner's substantive due process rights have not been implicated. His claim of error fails.

B

Turner also contends that the sentencing court erred by imposing $200 in "court costs." This is so, he asserts, because this fee was discretionary and should have been waived by the sentencing court along with the discretionary $250 witness fee. He is wrong.

- 19 -

A pertinent statute requires that courts impose a filing fee on certain criminal defendants. "Upon conviction or plea of guilty, upon failure to prosecute an appeal from a court of limited jurisdiction as provided by law, or upon affirmance of a conviction by a court of limited jurisdiction, an adult defendant in a criminal case shall be liable for a fee of two hundred dollars." RCW 36.18.020(2)(h). Sentencing courts do not have the discretion to decline to impose mandatory LFOs. State v. Clark, 191 Wn. App. 369, 373, 362 P.3d 309 (2015).

At sentencing, Turner's defense counsel requested that only the mandatory LFOs be imposed, which he described as the $100 DNA fee, the $500 victim fee, and $200 in court costs. The sentencing court agreed and imposed only those fees. However, the sentencing court did not specify the statutory basis for the $200 "court costs" assessment. "Court costs" may generally refer to both discretionary LFOs, such as a witness fee, and mandatory LFOs, such as a filing fee.

As the $200 filing fee is a mandatory LFO—and the sentencing court did not otherwise assess the filing fee—it is clear from the record that the $200 in court costs is, in fact, the mandatory filing fee. Turner has not explained how the $200 in court costs could be anything else in light of the filing fee being otherwise not ordered. Accordingly, there was no error.[7]

---

[7] Turner also asserts that (1) he received ineffective assistance of counsel because his defense counsel failed to object to the imposition of the $200 in court costs, and (2) even if the $200 in court costs are a mandatory filing fee, they are an unconstitutional denial of due process as applied to indigent defendants. For the reasons discussed herein, both of these assertions fail.

## IV

Turner requests that we exercise our discretion and deny any request for an award of costs on appeal. In reply, the State contends that it may not seek such an award and, thus, we should refrain from ruling on Turner's request.

We decline to rule on this request. However, should the State file a request for such an award, our court's commissioner is ordered to pass the request to this panel for decision.

Affirmed.

Dwyer, J.

We concur:

Cox, J.